AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of

(Name, address or brief description of person, property, or premises to be searched)

**UNDER SEAL**

**2003 FORD**
**VIN # 1FDWE45F33HB37323**

**APPLICATION AND AFFIDAVIT**
**FOR SEARCH WARRANT**

CASE NUMBER:

(Further described below)

I ___**E. Troy Yeager**___ being duly sworn depose and say:

I am a(n) ___**Special Agent with the United States Department of Health and Human Services-OIG (DHHS-OIG)**___
  and have reason to believe          (Official Title)

that ☐ on the person of or ☒ on the property or premises known as  (name, description and or location)

**2003 FORD,  VIN # 1FDWE45F33HB37323 (as further described in "Attachment A")**

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property to be searched) **SEE ATTACHMENT B.**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure) **fruits, evidence and instrumentalities.**

concerning a violation of Title __**18**__ United States Code, Section(s) **§ 1347.** The facts to support a finding of Probable Cause are as follows:

**SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN**

Continued on the attached sheet and made a part hereof.     ☒ YES   ☐ NO

**Virginia Cheatham, AUSA**
**U.S. Attorney's Office for District of Columbia**
**202-514-9732**

_____
**Signature of Affiant**
**E. Troy Yeager,**
**United States Department of Health and Human Services-OIG**

Sworn to before me, and subscribed in my presence

_____
Date

at Maryland

_____
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

## AFFIANT

1.      Your Affiant, Special Agent E. Troy Yeager has been a Special Agent with the

United States Department of Health and Human Services – Office of Inspector General

(DHHS-OIG) since November 2001.  Special Agent Yeager attained a Bachelors degree

in criminal justice at Northeastern University.  Special Agent Yeager successfully

completed the Criminal Investigator Training Program at the Federal Law Enforcement

Training Center (FLETC), and the Inspector General Investigator Training Program at the

FLETC.  He has been involved in numerous investigations pertaining to health care fraud

and the diversion of pharmaceutical drugs.  Special Agent Yeager has also been the

Affiant and/or participant on numerous search and seizure warrants.  Special Agent

Yeager has also been involved in the debriefing of informants and has made or

participated in arrests in health care fraud investigations.

## INTRODUCTION

2.     Based on the information set forth below, your affiant has probable cause to

believe that located at the office/home of Leonard H. Young and three vehicles owned or

leased by Leonard H. Young or Young Stars Tours, is evidence of Health Care Fraud in

violation of Title 18 United States Code, Section 1347, and that the locations contain

contraband, the fruits of crime, property designed or intended for use and which is and

has been used as means of committing the offense, other evidence of the offense, and

those specific items are listed in the attached "ATTACHMENT B".

3.      The information contained in this affidavit is based on your Affiant's personal

knowledge and on information provided to him by Special Agents of the Federal Bureau

of Investigation (FBI) and other government personnel of the Government of the District

of Columbia, Department of Health, Medical Assistance Administration (MAA), Office

of Investigations and Compliance (OIC).

4.      This affidavit is not intended to include each and every fact related to this

investigation.  This affidavit only sets forth those facts necessary to support probable

cause to believe that  kept and concealed within the below listed premises and

transportation vehicles are fruits, instrumentalities and evidence of violations of Title 18

United States Code Section 1347 (1):  to defraud any health benefit program.

- 1990, Ford, VIN#

- 2003, Ford, VIN#

- 2005, Ford, VIN#

## MEDICAID PROGRAM

5.      Medicaid is a program that provides medical assistance for certain individuals and

families with low incomes and resources.   Medicaid is a "health care benefit program" in

that it is a public plan, affecting commerce, under which a medical benefit, item, or

service is provided to individuals, and for which payment may be made under the plan or

contract. The Medicaid program became law in 1965 as a jointly funded cooperative

venture between the Federal and State governments to assist States in the provision of

adequate medical care to eligible needy persons.   The United States Department of

Health and Human Services, Centers for Medicare and Medicaid Services (hereafter,

"CMS") is the Federal component responsible for oversight of the Medicaid programs

throughout the United States.

6.      Medicaid operates as a vendor payment program, with payments made directly to the providers.  Providers participating in Medicaid must accept the Medicaid reimbursement level as payment in full.  Each State has relatively broad discretion in determining (within federally-imposed upper limits and specific restrictions) the reimbursement methodology and resulting rate for services.  States may impose nominal deductibles, co-insurance, or co-payments on some Medicaid recipients for certain services.

7.      Title XIX of the Social Security Act, which established Medicaid, allows considerable flexibility within the States' Medicaid plans.  However, some Federal requirements are mandatory if Federal matching funds are to be received. A State's Medicaid program must offer medical assistance for certain basic services to most categorically needy populations.  States may also receive Federal matching funds to provide certain optional services.

8.      Under the District of Columbia's Medicaid Program, transportation is provided, if requested and the need is established, to all eligible Medicaid recipients who are seeking medical care and services covered under the program.  Federal laws, regulations and rules prohibit falsely claiming transportation expenses not requested and authorized by the District of Columbia's Medicaid Program, or not actually incurred or medically necessary.

9.      CMS contracts with insurance carriers such as Affiliated Computer Services (ACS), and it predecessor, First Health, to process claims and reimburse transportation providers for reasonable claims relating to pre-authorized transportation of Medicaid recipients.

## BILLING FOR SERVICES NOT RENDERED

10.     Based on your affiant's training, knowledge and experience in the investigation of health care fraud, he knows that billing for services not rendered is a common fraud scheme used by Medicaid transportation providers to defraud the District of Columbia Medicaid program.  Billing for services not rendered is a term used when a Medicaid provider submits a code to Medicaid for reimbursement for a service that they never provided.  Providers bill for services not rendered in order to obtain monetary reimbursement from the Medicaid program for a service that they did not render.

## YOUNG STAR TOURS

11.     DHHS-OIG and FBI have been conducting an investigation of Young Star Tours, AKA: Young Transportation Inc. since June 20, 2007.  This investigation was initiated based on a referral from the MAA, OIC.  Throughout the course of this investigation it has been determined through review of Government of the District of Columbia, Department of Health, Medical Assistance Administration, Provider Application, review of documents from the Washington Metropolitan Area Transit Commission (WMATC), surveillance, trash covers and a consensually monitored phone call that Young Star Tours (Provider # 026788700) is a District of Columbia Medicaid Transportation provider located at 7003 T_____ Ave_____, Temple Hills, MD 20748 and that an owner of Young Star Tours is Leonard H. Young, DOB: XX/XX/1951.

## PROBABLE CAUSE

12.     The MAA OIC conducted a post payment review of paid claims submitted to DC Medicaid by Young Star Tours for dates of alleged services from January 2003 to August 2006.  Young Star Tours' top fifteen (15) recipients were selected for analysis and

investigation.  By "top," I mean those fifteen (15) recipients who were the subject of the

most billings from Young Star Tours.  Stated another way, the claims for services

allegedly provided to these fifteen (15) recipients comprised over 85% of the total

Medicaid claims submitted during this time period by Young Star Tours.  The post

payment review consisted of records review and interviews of recipients, responsible

parties, primary case managers, primary care givers, medical records technicians and

administrators for the top fifteen (15) recipients.  The post payment review showed that

Young Star Tours billed and was paid for fraudulent claims related to each of the fifteen

(15) patients selected.  DHHS-OIG and FBI conducted further investigation based on

MAA OIC's post payment review.  Investigation revealed that for the fifteen (15)

recipients Young Star Tours has billed for at least 6,158 fraudulent claims causing a loss

to DC Medicaid of at least $199,475.  Below is a summary of five (5) of the recipient's

claims investigated.

**Medicaid Recipient C.C.**

13.     On January 26, 2007, an investigator with MAA OIC  interviewed Tracy

Plummer, Director of Nursing at St. Thomas Moore Nursing and Rehabilitation.

Plummer advised that C.C. was admitted to St. Thomas Moore on November 20, 2003

and as of January 26, 2007 was still a resident.  Plummer stated that C.C. receives day

treatment, psychiatric, physician, podiatry, ophthalmology and prescription services at

the facility and does not receive any services outside of the facility. Your Affiant

reviewed Medicaid claims data, which shows that St. Thomas Moore continued to bill for

C.C. until May 31, 2007.  Medicaid claims shows that during the dates that C.C. was a

resident at St. Thomas Moore, Young Star Tours billed and was paid for 1,062 services, which they did not render to C.C. causing a loss to the Medicaid program of $33,797.50.

14.    On March 16, 2007, an investigator with MAA confirmed that C.C. received inpatient services at Providence Hospital from September 24, 2003 to October 3, 2003 and from November 2, 2003 to November 20, 2003.  Medicaid claims shows that during the dates that C.C. was inpatient at Providence Hospital, Young Star Tours billed and was paid for 20 services, which they did not render to C.C. causing a loss to the Medicaid program of $660.

**Medicaid Recipient T.W.**

15.    On February 7, 2007, an investigator with MAA OIC interviewed Ms. Wheeler, Executive Director, Home Care Services, Inc.  Wheeler advised that T.W. has been cared for by Total Care Services since February 2004, included in T.W.'s treatment program, was the purchase of a vehicle to provide transportation for T.W., which her staff used to drive T.W. to and from her appointments outside her home.   Medicaid claims shows that Total Care Services began billing for T.W. on June 2, 2004. On July 10, 2007, your Affiant interviewed Anthony Imeokparia, program compliance, Total Care Services. Imeokparia advised that T.W. was a patient of Total Care Services from June 2004 to October 2006.  During that time, T.W. was transported by Total Care Services and no other transportation company transported T.W. During the dates that T.W. was being cared for by Total Care Services, Young Star Tours billed and was paid for 721 services, which they did not render to T.W. causing a loss to the Medicaid program of $23,606.

16.    On March 16, 2007, An investigator with MAA OIC  confirmed that T.W. received inpatient services at Providence Hospital from May 20, 2003 to May 24, 2003 and from

August 9, 2003 to August 14, 2003.  On the same date, An investigator with MAA OIC confirmed that T.W. received inpatient services at Georgetown University Hospital from June 14, 2003 to June 18, 2003, June 23, 2003 to June 25, 2003 and from September 2, 2003 to September 4, 2003.  Medicaid claims shows that during the dates that T.W. was inpatient at Providence Hospital and Georgetown University Hospital, Young Star Tours billed and was paid for 10 services, which they did not render to T.W. causing a loss to the Medicaid program of $312.

17.      On July 10, 2007, your Affiant searched public records and determined that T.W. died on October 19, 2006.  Young Star Tours billed DC Medicaid for six (6) transportation services after T.W.'s date of death.  DC Medicaid did not pay Young Star Tours for the billed services.

**Medicaid Recipient K.T.**

18.      On March 30, 2007, an investigator with MAA OIC  interviewed Betty Wood, Resident Coordinator, Associated Community Services (ACS).  Wood advised that she has been with ACS and assigned to K.T. since April 2004.  Wood advised that ACS provides van transportation for K.T. and ACS staff drives the van.  ACS is responsible for transporting K.T. to his doctors, day treatment and other appointments.  On July 10, 2007, your Affiant interviewed Betty Wood.  Wood advised that to date, K.T. is still a consumer at ACS and has been since June 23, 1992.  Wood stated ACS transports K.T. to work, activities and everything else and that no one else has transported K.T. in the last two (2) years.  Wood said that sometime in the later part of 2004 On The Go Transportation transported K.T.  On July 10, 2007, your Affiant interviewed Linda Simmons, Program Director, ACS.  Simmons advised that she has never heard of Young

Transportation or Young Star Tours.  As far as she knows Young Star Tours never transported K.T.  Simmons said that she would check her records for prior authorization forms.  On July 19, 2007, Simmons provided your Affiant with prior authorization forms indicating that ACS was authorized to provide transportation services for K.T. from July 15, 2004 to present.  On July 19, 2007, Simmons explained that the forms indicate that ACS provided all transportation services for K.T. during that time.  Furthermore, Simmons advised that prior to July 15, 2004, K.T. was in an Intermediate Care Facility at ACS and all services were provided there.  Medicaid claims shows that from December 31, 2002 to June 2, 2007, dates that K.T. was receiving services from ACS, Young Star Tours billed and was paid for 1,277 services, which they did not render to K.T. causing a loss to the Medicaid program of $40,533.50

**Medicaid Recipient J.R.**

19.	On January 24, 2007, an investigator with MAA OIC  interviewed Cybrina Jackson, Unit Secretary, Health Care Institute (HCI).  Jackson advised that J.R. was admitted on September 1, 2005 and as of January 24, 2007 is still a resident.  During the time that J.R. was a resident of HCI, he has had four (4) ER visits.  On each occasion, he was transported via ambulance.  On one (1) occasion, J.R. had an MRI procedure outside of the facility and was transported by L&M Transportation Services.  All other medical services for J.R. are rendered at HCI and all of J.R.'s medications are delivered to HCI.  On July 10, 2007, your Affiant interviewed Sandra Harris, Supervisor, HCI.  Harris advised that J.R. is still a patient at HCI and he has not left the facility or received transportation services in a long time.  Medicaid claims show that during the dates that J.R. was a resident

of HCI, Young Star Tours billed and was paid for 535 services, which they did not render to J.R. causing a loss to the Medicaid program of $16,395.50.

20.     On March 20, 2007, an investigator with MAA OIC  confirmed that J.R. received inpatient services at Greater Southeast Community Hospital from July 30, 2005 to August 6, 2005.  Medicaid claims shows that during the dates that J.R. was inpatient at Greater Southeast Community Hospital, Young Star Tours billed and was paid for 5 services, which they did not render to J.R. causing a loss to the Medicaid program of $165.

**Medicaid Recipient T.H.**

21.     On January 26, 2007, an investigator with MAA OIC  interviewed T.H.'s case manager Joseph Rochette. Rochette advised that T.H. has been receiving services from DC Association for Retarded Citizens (DCARC) on Monday thru Friday only since March or April of 2004.  Holder provided An investigator with MAA OIC  with DCARC's attendance information for T.H.  The attendance information and Medicaid data shows that T.H. was absent from DCARC on 37 occasions and no other claims for other medical services were rendered on the absent days. Medicaid claims show that Young Star Tours billed and was paid for 37 services when T.H. was absent from DCARC causing a loss to the Medicaid program of $1,221.

22.     Interviews conducted by an investigator with MAA OIC  with Rochette and T.H.'s mother confirm that T.H. receives services Monday thru Friday and does not receive any services on the weekends.  Medicaid claims show that from November 2003 to August 2006, Young Star Tours billed and was paid for 134 claims with Saturday dates of service causing a loss to the Medicaid program of $4,422.

23.    On July 10, 2007, your Affiant interviewed T.H's mother.  T.H.'s mother advised that since sometime in August of 2006, she believes the 18th, On The Go Transportation has been providing transportation services for her son.  Young told T.H.'s mother that he did not want to provide services in the evenings.  Since On The Go Transportation started providing services for her son, Young Star Tours has not provided any services.  A review of Medicaid data confirms that On The Go Transportation started billing for T.H. on August 18, 2006.  From August 18, 2006 to June 2, 2007, Young Star Tours billed and was paid for 240 services for T.H. that they never provided causing a loss to the Medicaid program of $6,666.

## 7003 T_____ AVE_____

24.    At various times between in or about January 2003 and June 2007, Medicaid (through ACS) paid for the claims listed above in paragraphs 13 through 23 by sending a check to Young Star Tours, at the address of 7003 T_____ Ave_____, Temple Hills, Maryland.  In addition, as recently as July 20, 2007, Medicaid (through ACS) paid for transportation claims submitted by Young Star Tours by sending a check to the same address, 7003 T_____ Ave_____, Temple Hills, Maryland.

25.    Your affiant has conducted a real property data search on the Maryland Department of Assessment and Taxation web site for address 7003 T_____ Ave_____, Temple Hills, MD 20748.  The Maryland Department of Assessment and Taxation lists the owners of the address as Leonard H. Young and Dorise Young.  Furthermore, on June 29, 2007, FBI Special Agent Greg Domroe conducted surveillance at 7003 T_____ Ave_____, Temple Hills, MD 20748.  During the course of the surveillance Domroe observed four (4) vehicles:

- A gold colored, Mercury Cougar, MD Tag GHX697, registered to Young Star Tours, 7003 T_____ Ave_____, Temple Hills, MD 20748;

- A white colored, Ford passenger van, DC Tag B41671, registered to Leonard H. Young, 3694 H_____Street, NE, Suite #204, Washington, DC 20019;

- A blue colored, Ford pickup truck, MD Tag 49689CA, registered to Leonard Harry Young, 7003 T_____ Ave_____, Temple Hills, MD 20748; and

- A gold colored Dodge Durango, MD Tag 4294DA, registered to Leonard Harry Young, 7003 T_____ Ave_____, Temple Hills, MD 20748.

26.     On June 29, 2007 and July 3, 2007, Domroe conducted trash covers at 7003 T_____ Ave_____, Temple Hills, MD 20748.  The trash can were located at the curb by the green utility box next to the house's driveway.  Among other things, Domroe recovered the following from the trash:

- An empty envelope from ACS, dated June 25, 2007;

- An ACTT Now Transaction Report dated May 2, 2007, which summarizes claims filed;

- A fax transaction report dated June 26, 2007. The fax was addressed to Young Star Tours, fax number (301) 449-2797;

- An income statement for Young Transportation Inc., which lists business expenses;

- A piece of a letter from M&T Bank, addressed to the business Owner Young Star Tours, 7003 Tarquin Ave; and

- An ACTT Now Transaction report reflecting claims submitted on May 10, 2007 and May 24, 2007.

27.    On July 9, 2007, your Affiant consensually monitored a ruse telephone call from MAA to Leonard Young.  Young advised that he and his wife own Young Star Tours, which is now Young Transportation, Inc.  His wife does the billing and he has been trained by ACS on billing procedures.  Young also confirmed that his address is 7003 T_____ Ave_____, Temple Hills, MD.

28.    Your Affiant reviewed an overview of the regulations that govern the DC Medicaid provider activities, which states "Providers shall retain for a minimum of six years (unless otherwise specified), medical and financial records that fully disclose the nature and extent of the services rendered to recipients".

29.    Your affiant submits that based on records review, surveillance, trash covers and a monitored phone call that Leonard H. Young currently resides at 7003 T_____ Ave_____, Temple Hills, MD 20748.  In addition, your affiant submits that based on the results of trash cover documents relating to Young Star Tours are stored at 7003 T_____ Ave_____, Temple Hills, MD 20748.

## TRANSPORTATION VEHICLES

30.    Your affiant has reviewed the Washington Metropolitan Area Transit Commission (WMATC) Annual Report of Young Star Tours, AKA: Young Transportation Inc.  Leonard H. Young self-reported to the WMATC that as of January 6, 2007 the following is a list of Young Transportation Inc.'s revenue vehicles:

- 1990, Ford, VIN#

- 2003, Ford, VIN#

- 2005, Ford, VIN#

On July 23, 2007, I requested other law enforcement agents to check the registration of the above-listed tags. For two of the vehicles, the tags were registered to either Young Star Tours or Leonard Young with addresses in the District of Columbia. The third vehicle was listed to a leasing company. I also requested law enforcement to check the vehicles based on theVIN numbers for the above-listed vehicles. Agents informed me that the above vehicles, based on the VIN number, were registered to: for the1990 vehicle, registered to Young Star Tours, with an address of 4025 M_____Ave SE (error in original), Washington, DC 20019; for the 2003 vehicle, registered to a leasing company; for the 2005 vehicle, registered to Leonard H. Young, with an address of 3694 H_____Street, NE, # 204, Washington, DC 20019.

31.    Your affiant knows through his training, knowledge and experience that the revenue vehicles are used to transport Medicaid beneficiaries and can be considered an extension of the business Young Star Tours. In addition, the above listed vehicles typically contain vehicle run sheets. Vehicle run sheets are forms filled out by the driver of the vehicle that contain information such as: name of Medicaid beneficiary, date, time, destination, driver, service provided, etc. Typically this information is forwarded to the billing department so that the correct code is billed to the Medicaid program.

32.    Your affiant submits that based on his training, knowledge and experience the vehicles listed above contain vehicle run sheets and other pertinent records related to the billing of Medicaid transportation services.

## **RECORDS KEPT**

33.    Based on my knowledge, training and experience, Medicaid Providers such as Leonard H. Young and Young Star Tours maintain the books and records at their

registered location.  The Young Star Tours Mental Retardation Waiver Services Medicaid

application dated November 1, 2004 listed the registration address as 4025

M_____Avenue, Washington, DC 20019, but listed their additional office address,

address for payments and correspondence address as 7003 T_____ Ave_____, Temple

Hills, MD 20748.  On a form dated November 29, 2005, Leonard H. Young submitted a

"change of address" form changing the "Young Star Tours" registered address from 4025

Minnestoa Avenue, N.E. to 7003 T_____ Ave_____, Temple Hills, Maryland.

34.In an application dated in 2002, Leonard Young indicated that he would be filing

bills electronically.  Based on my review of the billing records, it appears that Young Star

Tours has, at times, billed Medicaid electronically, rather than submitted hard copies of

claims or  bills.  Use of a computer is needed to bill electronically.  Finally, based on my

knowledge, training, and experience, I know that businesses keep records on computers

and on other electronic devices.

## **ELECTRONIC EVIDENCE**

35.    Your affiant knows that computer hardware, software, documentation, passwords,

and data security devices may be important to a criminal investigation in two distinct and

important aspects: (a) the objects themselves may be instrumentalities, fruits, or evidence

of crime, and/or (b) the objects may have been used to collect and store information about

crimes (in the form of electronic data).   Rule 41 of the Federal Rules of Criminal

Procedure permits the government to search and seize computer hardware, software,

documentation, passwords, and data security devices which are instrumentalities, fruits,

or evidence of crime, or storage devices for information about crime.

36.    Based upon the facts set forth above, there is probable cause to believe that computer hardware, software, related documentation, passwords, data security devices (as described below), and data found at the residence of Leonard H. Young were integral tools of these crimes and constitute the means of committing it.  As such, they are instrumentalities and evidence of the violations designated.  Rule 41 of the Federal Rules of Criminal Procedure authorizes the government to seize and retain evidence and instrumentalities of a crime for a reasonable time, and to examine, analyze, and test them. It is the intent of the agents to copy the electronic evidence at the search site (by creating a "mirrored" image of the data).  If this copying cannot be accomplished, then the procedures outlined in paragraphs 35 to 45 will be followed:

37.    Hardware: Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Hardware includes, but is not limited to, any data-processing devices (such as central processing units); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disks drives and diskettes, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, video display monitors, and related communications devices (such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

38.    Software: Computer software is digital information that can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form, including zip drives.  It commonly includes programs to run operating systems, applications (like tax preparation, word-

processing, or spreadsheet programs), and utilities.

39.    <u>Documentation</u>: Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

40.    <u>Passwords and Data Security Devices</u>: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or other programming code. A password (a string of alphanumeric characters) usually operates a sort of digital key to unlock particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates test keys or hot keys, which perform certain preset security functions when touched. Data security software or code may also encrypt, compress, hide, or booby-trap protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

41.    Based upon my knowledge, training and experience, and consultations with computer specialists from the Department of Health and Human Services, your affiant knows that searching and seizing information from computers almost always requires agents to seize most or all electronic storage devices (along with related peripherals, as discussed below) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

42.    <u>Volume of Evidence</u>: Computer storage devices (like hard disks, and diskettes) can store the equivalent of thousands of pages of information. Additionally, a suspect

may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

43.     Technical Requirements:  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. However, data search  protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis.

44.     Based upon my knowledge, training and experience and consultations with forensic computer examiners, your affiant knows that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a

17

qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

45.    The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

46.    If, after inspecting the I/O devices, software, documentation, and data security devices, the analyst determines that these items are no longer necessary to retrieve and preserve the data evidence, the government will return them within a reasonable time.

47.    Data analysts may use several different techniques to search electronic data for evidence or instrumentalities of crime. These include, but are not limited to, the following: examining file directories and subdirectories for the lists of files they contain; opening or reading the first few pages of selected files to determine their

contents; scanning for deleted or hidden data; searching for key words or phrases ("string searches").

48.    This specifically excludes a search of any kind of unopened electronic mail, and no warrant is herein sought for such unopened electronic mail. If unopened electronic mail is to be searched, a separate warrant will be sought supported by probable cause.

## CONCLUSION

49.    Your affiant believes based on the above described-facts that there is probable cause to believe that Leonard H. Young and/or Young Star Tours knowingly and willfully executed or attempted to execute a scheme or artifice to defraud the Medicaid health care benefit program in connection with the delivery of or payment for health care benefits, items, or services, in that he and/or it used Medicaid recipient information to bill Medicaid for transportation services not actually provided.

50.    Based on the foregoing information and upon your affiant's training, knowledge and experience in the investigation of health care fraud, your affiant believes that fruits, instrumentalities and evidence, as described in Schedule B, of violation of Title 18 United States Code Section 1347 (1):  to defraud any health benefit program are kept and concealed within the below listed premises and transportation vehicles and therefore, search warrants are requested for:

- 1990, Ford, VIN#

- 2003, Ford, VIN#

- 2005, Ford, VIN#

**ATTACHMENT A**

This affidavit is being submitted in support of an application for a warrant to search the 2003 Ford truck operated by Young Star Tour, Vehicle Identification Number: XXXXXXXXXXXXXX.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Based on the facts as are recited in the attached affidavit, your affiant has probable cause to believe the following records, documents, and materials are located at the above premises, and that these items may contain fruits, evidence and instrumentalities of the crimes described in the affidavit.

The terms "records," "documents," and "materials" include all of the subsequent items of evidence in whatever form and by whatever means such records, documents or materials, their drafts, or their modifications may have been created and stored, including, but not limited to, any handmade form (such as writing or drawing with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing or typing); and any electrical, electronic or magnetic form (such as tape recordings, cassettes, compact discs or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives or electronic notebook, as well as printouts or readouts from any magnetic storage device).

Items subject to search and seizure are as follows:

1)    Any and all lists, files, notes, claim forms, bills, receipts, billing records, purchase records, correspondence, contracts/agreements, appointment books/calendars, business cards, notes, ledgers, employee/employer documents, independent contractor records, driving logs, attendance sheets, manual or electronic telephone directories and their contents, complaint letters/forms/notes, signature stamps, notes, markings, papers, folders, photographs, paper scraps, and partial documents relating to the individuals and businesses listed in the affidavit herein

2)    Any and all bank statements and records, checks, money drafts, money orders, letters of credit, cashiers' checks, safe deposit keys, statements of accounts, return and/or canceled checks, checkbooks and stubs, duplicate and copies of checks, deposit items, savings passbooks, loan documents and similar bank and financial accounts or other financial records relating to the individuals and businesses in the affidavit herein.

Computer-related items subject to search and seizure are as follows:

To effectuate the search and to the extent necessary to retrieve documents identified in the affidavit which may be stored electronically, the following items will be seized as needed:

3)    Hardware

Computer hardware consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.  Hardware includes (but is not limited to) any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices,

mechanisms or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

4)    <u>Documentation</u>

Computer-related documentation consisting of written, recorded, printed or electronically stored material which explains or illustrates how to configure or use the computer hardware, software or other related items.

5)    <u>Software</u>

Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, optical or other digital form.  It commonly includes programs to run operating systems, applications (like word-processing, graphics or spreadsheet programs), utilities, compilers, interpreters and communication programs.

6)    <u>Passwords and Date Security Devices</u>

Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data.  Data security devices may consist of hardware, software or other programming code.  A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips and circuit boards.  Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make inaccessible or unusable, as well as reverse the process to restore it.